## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL SCHROLL | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  C.A. No. 24-1349-JLH |
| | ) |
| DNSFILTER, INC. and KEN CARNESI, | ) |
| | ) |
| Defendants. | ) |

### DEFENDANTS DNSFILTER, INC. AND KEN CARNESI'S
### REPLY BRIEF IN FURTHER SUPPORT OF
### THEIR MOTION FOR SUMMARY JUDGMENT

*Of Counsel*:

Paul H. Schwartz
SHOEMAKER GHISSELI + SCHWARTZ LLC
1811 Pearl St.
Boulder, CO 80302
(303) 530-3452
pschwartz@sgslitigation.com

ASHBY & GEDDES
Philip Trainer, Jr. (#2788)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19801
(302) 654-1888
ptrainer@ashbygeddes.com
tlydon@ashbygeddes.com

*Attorneys for Defendants*

Dated: September 4, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

1. The Opposition Dodges the Essential Element at Issue: No Reasonable Altervative ........ 1

2. No Reasonable Jury Could Deny that Plaintiff Had the Reasonable Alternative of Delaying Signing the SA for a Week and Seeking Legal Advice ....................................... 2

3. Plaintiff's Ratification Clock Ran When the Alleged Threat Ended ................................. 6

4. The SA's Clear Anti-Reliance Clause Defeats Plaintiff's Fraud Challenge ....................... 7

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abry Partners V, L.P. v. F&W Acq. LLC*,
   891 A.2d 1032 (Del. Ch. 2006) ............................................................................................. 9, 10

*Am. Life Ins. Co. v. Parra*,
   63 F. Supp. 2d 480 (D. Del. 1999) ................................................................................................ 1

*Edge of the Woods, L.P. v. Wilmington Sav. Fund Soc'y*,
   2001 WL 946521 (Del. Super. Aug. 16, 2001) ........................................................................ 1, 2

*In re IBP S'holders Litig.*,
   789 A.2d 14 (Del. Ch. 2001) ........................................................................................................ 7

*Lyons Ins. Agency, Inc. v. Wark*,
   2020 WL 429114 (Del. Ch. Jan. 28, 2020) ................................................................................... 9

*Maka v. Musial*,
   2025 WL 1744936 (Del. Super. June 11, 2025) .......................................................................... 1

*McClellan v. Midwest Mach., Inc.*,
   900 F.3d 297 (6th Cir. 2018) ........................................................................................................ 6

*Phoenix Equity Group LLC v. BPG Justison P2 LLC*,
   2010 WL 1223619 (Del. Ch. Mar. 25, 2010) ............................................................................. 10

*ITC v. Pilkington PLC*,
   137 F.3d 1382 (9th Cir. 1998) ...................................................................................................... 7

*RAA Mgmt., LLC v. Savage Sports Holds., Inc.*,
   45 A.3d 107 (Del. 2012) ............................................................................................................... 9

*Reiver v. Murdoch & Walsh P.A.*,
   625 F. Supp. 998 (D. Del. 1985) .................................................................................................. 2

*Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*,
   2012 WL 1409013 (Del. Super. Apr. 4, 2012) ............................................................................. 1

*Shore Builders, Inc. v. Dogwood, Inc.*,
   616 F. Supp. 1004 (D. Del. 1985) ................................................................................................ 7

*Techview Invs. Ltd. v. Amstar Pol. Prop. Fund I, L.P.*,
  2021 WL 3891573 (Del. Super. Aug. 31, 2021) .................................................................. 10

*Way Rd. Dev. Co. v. Snavely*,
  1992 WL 19969 (Del. Super. Jan. 31, 1992) ........................................................................ 2

*Zazzali v. Wavetronix LLC*,
  2011 Bankr. LEXIS 2069 (Bankr. D. Del. May 27, 2011) ................................................... 7

**Other Authorities**

Restatement (Second) of Contracts § 175(1) ............................................................................. 1, 2

Restatement (Second) of Contracts § 380 .................................................................................... 11

Restatement (Second) of Contracts § 381 .................................................................................... 11

1.        **The Opposition Dodges the Essential Element at Issue: No Reasonable Alternative.**

To prevail on a duress claim, a plaintiff must prove that their "assent [wa]s induced by an improper threat by the other party *that le[ft] the victim no reasonable alternative*." Restatement (Second) of Contracts § 175(1).[1] "A threat, even if improper, does not amount to duress if the victim has a reasonable alternative to succumbing and fails to take advantage of it." *Id*. cmt. b, quoted in, *e.g.*, *Maka v. Musial*, 2025 WL 1744936, at *6 n.81 (Del. Super. June 11, 2025); *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 2012 WL 1409013, at *7 (Del. Super. Apr. 4, 2012); *Edge of the Woods, L.P. v. Wilmington Sav. Fund Soc'y*, 2001 WL 946521, at *6 (Del. Super. Aug. 16, 2001). Although some cases discuss the no-reasonable-alternative element in terms of "free will" and/or "adequate legal remedy," *e.g.*, *Edge*, 2001 WL 946521, at *6, those word variations are not substantive; Plaintiff agrees Delaware "follows Section 175 of the Restatement." D.I. 38 at 8. A central focus of Defendants' opening brief ("OB") is thus how Plaintiff failed to avail himself of "a reasonable alternative to signing the" Severance Agreement ("SA"). D.I. 109 at 1, 6-11. *Yet the Opposition does not even mention "reasonable alternative."* This silence speaks volumes. Plaintiff cannot deny what is common sense: that if one can put off signing a contract and get legal advice, they have a reasonable alternative to succumbing to it. *E.g.*, *Am. Life Ins. Co. v. Parra*, 63 F. Supp. 2d 480, 499 (D. Del. 1999) (granting JNOV; party "knew he could have delayed signing the release" and sought lawyer); *Riverbend*, 2012 WL 1409013, at *7 (granting summary judgment; "Plaintiffs were free to consult an attorney prior to executing the Release").

Plaintiff's cases do not suggest otherwise. Those cases hold that when a person *does* consult a lawyer, or is a lawyer, they nonetheless might be left with no reasonable alternative but to sign.

---

[1] Emphasis is added and citations and quotations are omitted unless otherwise stated. Capitalized terms and abbreviations have the same meanings as in Defendants' opening brief.

*Way Rd. Dev. Co. v. Snavely*, 1992 WL 19969, at *4 (Del. Super. Jan. 31, 1992) (consultation); *Reiver v. Murdoch & Walsh P.A.*, 625 F. Supp. 998, 1014 (D. Del. 1985) (plaintiff was attorney). That is true. Sometimes a lawyer will assuage the client's concerns about a proposed contract, either by advising them that they need not sign it or by reassuring them so that they sign it without duress; sometimes the lawyer will not. When a party passes up a chance to delay signing and get legal advice, however, they destroy the possibility of the former and ensure the latter—exactly what the law, by requiring parties to pursue reasonable alternatives, does not tolerate.

Plaintiff tries to distinguish some cited cases by focusing on the "factors" by which those "plaintiffs' assents were driven." Opp. at 11-12. The assent element, however, is beside the point here. Defendants assume for this motion that Plaintiff assented to the SA because of the threat he alleges. He still must prove he had no reasonable alternative but to do so.[2] Nor is Plaintiff correct when he suggests courts should find a plaintiff had no reasonable alternative only when there is no evidence of a wrongful act. *Id*. at 12. Some cases find that the plaintiffs at issue failed to prove multiple duress elements. *Id.* Parties still must prove improper threat *and* no reasonable alternative.

Whether Plaintiff had a reasonable alternative "is a mixed question of law and fact, to be answered in clear cases by the court." Restatement § 175 cmt. b. This case is clear: DNSF gave Plaintiff a week to consult a lawyer and weigh the SA, but he failed to take advantage of it.

**2.    No Reasonable Jury Could Deny that Plaintiff Had the Reasonable Alternative of Delaying Signing the SA for a Week and Seeking Legal Advice.**

To obscure how long Carnesi gave him to consider the SA, Plaintiff uses three tactics: minimize; divert; conflate. He **minimizes** Carnesi's Timing Explanation by calling it a "snippet"

---

[2] *Edge*, which Plaintiff cites, shows the availability of legal advice is also a consideration when analyzing what caused one's assent. 2001 WL 946521, at *6. Notably, it *granted* a Rule 56 motion, showing that even as to an assent factor, summary judgment is proper when the facts are clear.

{02160477;v1 }                                     2

and "passing comment" in which Carnesi was only "pretty sure" Plaintiff had a week to decide. Opp. at 6, 9-10. But labels cannot change the evidence. The June 8, 2021 recording proves Carnesi explained, slowly and clearly, which documents did and did not have to be signed that day:

> I'll send you over the three things. Like, one of them is a Board resignation letter. One of them is what an equity repurchase agreement looks like, and one of them is the severance, the severance. So, *the first two are the things with the 2:00 p.m. deadline. The severance—* [PLTF:] Mm-hm. [CARNESI:] *By Colorado law – I forget exactly what it is. I'll just refer to what it says in the document. Pretty sure it's seven days. You have any time between right now to seven days from now to sign that one. That one we can't tell you anything about.*

A0034; Rec. 24:43-25:25. Carnesi immediately emailed Plaintiff the three documents; before resuming the discussion, Plaintiff insisted on looking at what he sent. *Id.*; Rec. 25:25-26:33 ("[L]et me just look at these documents"). Carnesi's email asked Plaintiff to let DNSF know if he wanted to proceed "with *the stock sale and board resignation* before 2PM EST today." A0001. If so, DNSF "would need at least *document #1 and #2* by that time as well." *Id*. The email denoted #1 and #2 as "1.) The stock repurchase agreement 2.) The board resignation letter." *Id*. In contrast, the email instructed: "*The severance agreement timeline is dictated within that document itself*." *Id*. The attached draft SA gave Plaintiff seven days to consider it. A0026, § 5. Later, Carnesi repeated on Slack: "*we can't force the severance one … by law, you have seven days*." A0021-22. No reasonable jury could find that Carnesi hid or disguised the week Plaintiff had to consider the SA.

Plaintiff **diverts** by arguing that "[t]he test for determining whether the duress produced the assent is a subjective one that focuses on the state of mind of the 'victim' of the duress." Opp. at 6. Again, what produced Plaintiff's assent is a red herring; Defendants assume for this motion it was the alleged threat. The issue is whether he nonetheless had a reasonable alternative to signing.

Plaintiff's **conflation** tactic is exemplified by his argument that Carnesi "repeatedly hammered home" that he had to "sign both Agreements by 2:00 p.m. that day." Opp. at 7. That is false. The recording proves Carnesi mentioned severance only twice: one at the 15:39-16:10 mark,

when he offered Plaintiff severance, and the Timing Explanation at 24:35-25:39. What Plaintiff means by "repeatedly hammered home" is that when Carnesi repeatedly said *the SRA and resignation letter* had a 2:00 p.m. deadline he *implicitly* was saying that was the SA deadline because in his first reference to severance, Carnesi discussed a stock repurchase, resignation, and severance agreement together. Opp. at 6-8 (arguing that the "thrust" of Carnesi's message was that the agreements were a "package deal"). The fatal flaw with this argument is that after Carnesi made his first statement about severance, he *explicitly* clarified that Plaintiff did *not* have to decide that day whether to sign the SA. Plaintiff effectively is saying that once Carnesi made his initial statement, the summary judgment die was cast, regardless of Carnesi's clarifications. But that is not how summary judgment works. In deciding what inferences are reasonable and thus must be drawn in Plaintiff's favor, the Court must view the evidence in totality and in context. *Id*. at 6 (agreeing to same). Whatever Plaintiff might have thought during the nine minutes between Carnesi's first mention of severance and the Timing Explanation, once Carnesi clarified that only the SRA and resignation letter had the 2:00 p.m. deadline *and* specifically said that the SA deadline was the one set forth in the document (*i.e.*, seven days) *and* said Colorado law required that Plaintiff have that time to consider the SA *and* confirmed his explanation via email *and* reiterated the explanation via Slack, no one could reasonably have thought otherwise nor could a reasonable jury find Plaintiff lacked the reasonable alternative of delaying and seeking counsel.

      Plaintiff tries to muddy the waters surrounding the Timing Explanation by suggesting that after Carnesi gave the explanation, he made contrary statements about the SA deadline. Opp. at 8. Once again, though, the recording proves he did not. One exchange Plaintiff cites is when he asked how Carnesi would feel if Carnesi were asked "to forfeit $11.5 million of value in six hours" and Carnesi said the time was four hours. Opp. at 8. This exchange is entirely consistent with the

Timing Explanation as Plaintiff tied the same-day deadline just to the stock repurchase, which makes sense since this was only three minutes after Carnesi explained that only the SRA and resignation letter had the 2:00 p.m. deadline. A557; Rec. 28:26-28:52. When asked how, during this exchange, he factored in that Carnesi had just told him Colorado law required that he have the time to consider the SA that the SA set forth, Plaintiff testified: "Well, we had just got done talking about the three agreements, so that was the timing we were talking about that I have to make a decision about these agreements." A0129-31 (Dep. 52:25-54:6). But that is the point. No reasonable jury could find Plaintiff lacked the reasonable alternative of delaying signing the SA and consulting counsel because of "the timing [Carnesi and Plaintiff] were talking about" minutes earlier *when the timing they talked about was that Plaintiff did not have to decide on the SA that day*. The same goes for Plaintiff's other citation: "But do you know at this point that it's 2:00 p.m., 2:00 p.m. today our time, because we're going to have the all-hands after that?" Opp. at 8; Rec. 46:25-46:36. This does not mention the SA either. Plaintiff testified that it applied to the SA because "during the [meeting] Mr. Carnesi had discussed with [him] all three documents," ignoring that what Carnesi discussed was that the SA deadline was not 2:00 p.m. A0133 (Dep. 56:11-23).

And of course, Carnesi reiterated the one-week timeframe in the Confirming Email and, after the meeting, the Confirming Slacks. Plaintiff calls the email "ambiguous," Opp. at 9, but it clearly stated that the SA timeline was "dictated within that document itself" and attached a draft SA that clearly stated its timeline was a week. A0026, § 5. Plaintiff cannot even recall if he read the Slacks reminding him that "by law, you have seven days," but says it does not matter because he "understood that Ken was told by the lawyers to say those things." Opp. at 10 & n.8. Asked about this understanding in his deposition, Plaintiff insisted that the recording transcript confirms Carnesi told him seven days was just something the lawyers said he had to say. A0168-69 (Dep.

91:19-92:7). But the Opposition identifies no such statement in the transcript because none exists. Carnesi did say that "*[b]y Colorado law*" DNSF had to give Plaintiff the week the SA specified. A0555. But that is saying DNSF was *legally prohibited* from reducing the weeklong period, which is the opposite of saying the period should be disregarded. Plaintiff also argues that the SRA's and SA's merger clauses "[c]onfound[ed] matters." Opp. at 10. But neither clause said anything about *when* either contract had to be signed. *See* A0006, § 8; A0031, § 21. The *when* was addressed in § 5 of the SA, the Timing Explanation, the Confirming Email, and the Confirming Slacks.

Because no reasonable jury could deny that Plaintiff had a reasonable alternative to signing the SA—delaying and seeking legal advice—his duress challenge to it fails as a matter of law.

**3.    Plaintiff's Ratification Clock Ran When the Alleged Threat Ended.**

Plaintiff does not dispute that waiting three years to contest a contract is ratification as a matter of law. Opp. at 13-16. Instead, he argues he did not delay that long because his clock did not run until he learned in 2024 that DNSF had no right to claw back his stock. *Id*. As explained in §§ 380 and 381 of the Restatement, however, while the fraud-claim trigger for ratification is when a plaintiff knows of a misrepresentation, the duress-claim trigger is when "the circumstances that made [the contract] voidable have ceased to exist," *i.e.*, when the threat has ended. This difference makes sense. If one is forced to sign a contract against their will, they necessarily know it right away. If they do not, they did not sign under duress. Once the threatening circumstances "ceas[e] to exist," therefore, they can consult a lawyer and contest the contract. *See*, *e.g.*, *McClellan v. Midwest Mach., Inc.*, 900 F.3d 297, 310 (6th Cir. 2018) (quoting Restatement); *ITC v. Pilkington PLC*, 137 F.3d 1382, 1392 (9th Cir. 1998) (same). Although Delaware cases do not address §§ 380 and 381 in the duress context, several cite them in other contexts and there is no reason to believe courts would reject them for duress claims. *See*, *e.g.*, *In re IBP S'holders Litig.*, 789 A.2d 14, 78

n.190 (Del. Ch. 2001); *Shore Builders, Inc. v. Dogwood, Inc.*, 616 F. Supp. 1004, 1021 (D. Del. 1985); *Zazzali v. Wavetronix LLC*, 2011 Bankr. LEXIS 2069, at *10 (Bankr. D. Del. May 27, 2011).

It is thus beside the point that Plaintiff says he spent three years "under the false impression that [Carnesi] was his friend." Opp. at 14-15. He still alleges, as he must, that he felt economic duress on June 8, 2021 "from the board and investors." A0093, 96-97, 208 (Dep. 16:6-12, 19:22-20:2, 131:1-8); *see* Opp. at 13 (discussing his "great duress"). If that is true—if he really did sign the SA with "a proverbial gun to his head," D.I. 38 at 1—he knew it then. Plaintiff does not contend that once the agreements were signed, his remaining stock was threatened. Thus, the threatening circumstances ended that day and he had to disavow the SA and return his severance benefits within a reasonable time thereafter. Instead, he kept them for three years and ratified the contract.[3]

**4.      The SA's Clear Anti-Reliance Clause Defeats Plaintiff's Fraud Challenge.**

Plaintiff says the Court should not enforce the SA's anti-reliance clause ("ARC") because it is the product of duress. Opp. at 16. For the reasons above it is not and, anyway, he ratified the SA. Plaintiff also asks the Court not to enforce the ARC because he is "relatively unsophisticated." *Id*. That, too, is unsustainable, as Plaintiff undisputedly induced two private equity firms to buy $9.3 million of stock from him (and DNSF to approve the sales) by representing and warranting that he is a "sophisticated individual." OB at 16-17. Plaintiff says these representations "have no bearing" on this ARC because "[o]n their face" they were "expressly limited to 'transactions

---

[3] *VKK Corp. v. NFL* does not address the black-letter law above; it cites nothing for the proposition for which Plaintiff cites it. *See* 244 F.3d 114, 124 (2d Cir. 2001). But even it says a party "will ordinarily know at the time he executes [an] instrument that he is being economically coerced" and thus will "be able to disclaim the instrument immediately." *Id*. Though the court apparently thought the antitrust conspiracy there was not ordinary, as shown, Plaintiff admits he believed on June 8 that he was being economically coerced. The Opposition identifies nothing that prevented him from consulting a lawyer and disclaiming the SA quickly thereafter. Nor could it do so, since the "truth" the complaint alleges is that DNSF had no legal right to claw back Plaintiff's stock, *see* D.I. 6 ¶ 88, something a lawyer could have opined on any time Plaintiff consulted one.

similar to those contemplated' by the agreements in which they were contained." Opp. at 18. But *on their face* the agreements that contained the representations *contained ARCs*. A0601, § 4, A0622-23, § 4. Plaintiff cannot rationally claim he was sophisticated enough to agree to ARCs 19 months before and 10 days after he signed the SA but not when he signed the SA. Trying to wriggle out of his District of Colorado testimony describing his contract-negotiation "practice," OB at 16-18, Plaintiff says that testimony did not pertain to contracts "forced down his throat on three hours' notice." Opp. at 19. But that is just repeating his false duress allegation. He adds (dubiously) that ARCs are more complex than forum-selection clauses but omits that he also touted to the District of Colorado his practice of bargaining for choice-of-law clauses. *See id.*; D.I. 37-1, ¶ 27. The plain-English ARC here is far less complex than the choice clauses he testified he negotiated. Compare:

> 18. <u>No Representations</u>. Employee represents that he/she has had an opportunity to consult with an attorney, and has carefully read and understands the scope and effect of the provisions of this Agreement. Employee has not relied upon any representations or statements made by the Company that are not specifically set forth in this Agreement.

> (a)   **Governing Law**.   The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of South Carolina, without giving effect to principles of conflicts of law.

A0031; D.I. 37-6, ¶ 11(a). The Opposition stresses Plaintiff's role as DNSF's CTO and says he was less knowledgeable than Carnesi, Opp. at 19 & n.13, but offers no support for its assertion that "parity of sophistication" is required. Opp. at 19-20. As shown below, the question is whether the party seeking to avoid the ARC could comprehend and agree to it, not who is on the other side.[4]

Plaintiff's last argument—that ARCs are enforceable only if they are "the product of meaningful negotiations"—also is wrong. Opp. at 16. For one thing, enforceability is the rule, not

---

[4] Because of space constraints, Defendants rely on the OB for their further point concerning Plaintiff's six-year DNSF board membership, adding only that Plaintiff does not deny he was a party to still more complex contracts like those from DNSF's 2019 private-equity financing. *Compare* OB at 17 and A0347-401, A0446-530 *with* Opp. at 18-19 and D.I. 116 at 1, ¶ 2.

the exception. "Delaware is a pro-contractarian state." *Lyons Ins. Agency, Inc. v. Wark*, 2020 WL 429114, at *4 (Del. Ch. Jan. 28, 2020). The "general rule" is that "unambiguous contracts are enforced as written," though there are "public policy exceptions." *Id*. Plaintiff does not claim this ARC is ambiguous so he must justify a public policy *exception*. He cannot. The relevant policy is set forth in *Abry Partners V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032 (Del. Ch. 2006), and affirmed in *RAA Mgmt., LLC v. Savage Sports Holds., Inc.*, 45 A.3d 107, 117-19 (Del. 2012):

> If there is a public policy interest in truthfulness, then that interest applies with more force, not less, to contractual representations of fact [like ARCs]. Contractually binding, written representations of fact ought to be the most reliable of representations, and a law intolerant of fraud should abhor parties that make such representations knowing they are false.
>
> To fail to enforce non-reliance clauses is not to promote a public policy against lying. Rather, it is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners.

891 A.2d at 1057-58. Still, to protect against fraud, courts should enforce ARCs only if they contain a "clear" promise that the party in question "did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Id*. at 1059. The law thus strikes a balance. If one cannot reasonably know they are agreeing to an ARC (say, because it is unclear or they are too unsophisticated to understand it), the public policy favoring ARCs carries little weight. If, however, the ARC is clear and the party can understand it, then *non*-enforcement would violate public policy because it would excuse the "lie that [plaintiff] was relying only on contractual representations … to enable [them] to prove that [defendant] lied" outside the contract. *Id*. at 1058.

A clear ARC negotiated by sophisticated parties is the *strongest* case for enforcement. *See id*. (describing one who disavows such ARC as a liar in "the most inexcusable of circumstances"). But no case holds that a sophisticated party can win a public policy exception to a clear ARC by not negotiating, nor would that comport with the policy in *Abry*. Other cases enforce ARCs without

mentioning negotiation. *E.g.*, *Techview Invs. Ltd. v. Amstar Pol. Prop. Fund I, L.P.,* 2021 WL 3891573, at *10 (Del. Super. Aug. 31, 2021); *Phoenix Equity Group LLC v. BPG Justison P2 LLC*, 2010 WL 1223619, at *1-2 (Del. Ch. Mar. 25, 2010). In Plaintiff's case, *Gardoski v. Pats Aircraft*, Gardoski was a stockroom employee, "by all accounts, an unsophisticated party." 2018 WL 6427248, at *4 (D. Del. Dec. 7, 2018). Beyond not having been negotiated, Gardoski's ARC "exist[ed] within a boiler plate merger clause" that, "[u]nlike many of the clauses of the [contract], … was not set apart, bolded, capitalized, or in any way identified to call it out or signify its importance." *Id*. The Court held these alleged facts could survive a motion to dismiss. *Id*. at *4.

Plaintiff, in stark contrast, admitted he is a "sophisticated individual" when he agreed to ARCs 19 months before and 10 days after he signed the SA. He does not allege he was unaware of this ARC; to the contrary, he admits he "read the whole draft [SA]" before signing it, "probably more than once," A0139-40 (Dep. 62:2-63:2). Unlike the ARC in *Gardoski*, this ARC is a short, separate provision with an underlined title calling it out. *Supra* p.8. Though Plaintiff did not negotiate the SA, he could have. He had a week to consult counsel and respond to DNSF's draft. When he challenged the draft SRA, DNSF agreed to reduce the stock repurchase by 200,000 shares. SUMF ¶ 9. To find Plaintiff unsophisticated, invalidate the ARC, and allow Plaintiff to pursue his allegation of "blatant lies," Opp. at 16, the Court would have to find *he* blatantly lied, not just in the ARC but when he twice represented and warranted that he is sophisticated and familiar with transactions that include ARCs. In these circumstances, the public policy set forth in *Abry* requires enforcing the ARC, which defeats Plaintiff's fraud challenge to the SA as a matter of law. And because Plaintiff's duress and fraud challenges to the SA both fail, the SA's release defeats all his claims and establishes Defendants' counterclaim. Accordingly, Defendants respectfully request that the Court enter summary judgment in their favor.

|  |  |
|---|---|
| *Of Counsel*: | ASHBY & GEDDES |
|  | */s/ Tiffany Geyer Lydon* |
| Paul H. Schwartz | Philip Trainer, Jr. (#2788) |
| SHOEMAKER GHISSELI + SCHWARTZ LLC | Tiffany Geyer Lydon (#3950) |
| 1811 Pearl St. | 500 Delaware Avenue, 8th Floor |
| Boulder, CO 80302 | P.O. Box 1150 |
| (303) 530-3452 | Wilmington, Delaware 19801 |
| pschwartz@sgslitigation.com | (302) 654-1888 |
|  | ptrainer@ashbygeddes.com |
|  | tlydon@ashbygeddes.com |
|  | *Attorneys for Defendants* |

Dated: September 4, 2025